1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6          FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    RON CARLSON & MARION BENJAMIN            No. C 11-00356 SI
     CARLSON,
9                                            **ORDER GRANTING IN PART AND
                    Plaintiffs,              DENYING IN PART PLAINTIFFS'
10                                           MOTION FOR SUMMARY JUDGMENT**;
        v.                                   **GRANTING IN PART AND DENYING IN
11                                           PART DEFENDANTS' MOTION FOR
     CENTURY SURETY CO.,                     SUMMARY JUDGMENT**
12
                    Defendant.
13   _____/
14
15          On February 17, 2012, the Court heard argument on the parties' cross motions for summary
16   judgment. Having considered the arguments of counsel and the papers submitted, the Court hereby rules
17   as follows.
18
19                                    **BACKGROUND**
20          This is an action for failure to defend and failure to indemnify on a real estate errors and
21   omissions ("E&O") liability insurance policy.  Plaintiffs Ron Carlson and Marion Benjamin Carlson
22   ("the Carlsons") have brought an action for declaratory relief, breach of contract, and breach of the
23   covenant of good faith and fair dealing.  The Carlsons are suing under an assignment of rights from Gold
24   Mountain Investments, Inc. dba Prudential California Realty ("Gold Mountain") and Jane Lyla Oberg
25   (collectively, the "insured"), who were insured by defendant Century Surety Co. ("Century").  The
26   Carlsons allege that defendant Century refused to defend its insured in a state court suit brought by the
27   Carlsons against the insured, Betty Low and Julie Fox, both employees of Gold Mountain (collectively,
28   the "underlying defendants").  The Carlsons and the insured agreed to a settlement, in which the insured

1    consented to entry of default against it and assigned its rights against Century to the Carlsons, in

2    exchange for a covenant by the Carlsons not to execute the default judgment to be entered.  Thereafter,

3    the Carlsons brought this suit against Century, based on the assignment of rights.

4

5    **1.      The underlying claim**

6         The Carlsons listed their home for sale with Prudential California Realty.  On July 18, 2006,

7    plaintiffs entered into a sale agreement for $1,262,000.  Exhibits in Support of Def.'s Oppo. to Mot. for

8    Partial Summ. J. ("Def. Exs."), Ex. 8, CS 0337.  The sale fell through.  See *id.*, CS 0336.  On September

9    1, 2006, the purchaser signed papers releasing a $1,000 deposit to plaintiffs, which the Carlsons signed

10   as well.  *Id.*  The next day, the Carlsons returned to the real estate office and wrote on the papers that

11   they had been signed in error.  *Id.*  They told Julie Fox, a real estate agent in the office, that they wanted

12   $5,000 rather than $1,000.  *Id.* at CS 0329.  By July 2007, it became clear that the $1,000 had never been

13   deposited in escrow.  *Id.* at CS 0333.

14        The Carlsons filed suit against Prudential California in the Superior Court of California in San

15   Francisco on June 10, 2008, demanding over $65,000 in damages.  *Id.* at CS 0268–0287.  In May 2010,

16   the Carlsons entered into a settlement agreement with Prudential California, in which, among other

17   things, Gold Mountain and Oberg agreed to allow a default judgment to be entered against them.  Decl.

18   of Alan L. Martini in Supp. of Pl. Mot. for Partial Summ. J., Ex. 6, at 2.  The Carlsons promised not to

19   file a writ of execution on the judgment against Gold Mountain or Oberg.  *Id.*  Prudential California

20   assigned the Carlsons all of their claims and causes of action against Century.  *Id.*

21        On January 21, 2011, the Superior Court entered default judgment in favor of the Carlsons in

22   the amount of $3,334,834.61.  Martini Decl., Ex. 7, at 2.  Century has been unable to obtain a copy of

23   the transcript from this "prove up" hearing.[1]

24

25

26

27

28   _____

     [1]Century has since filed a complaint with the Court Reporters Board of California regarding the
     missing transcript.  Darling-Alderton Decl., ¶ 4.

**2.     The insurance policy**

Gold Mountain was the named insured on an E&O policy issued by defendant with a policy period from February 1, 2008 until February 1, 2009.  Def. Exs., Ex. 22, CS 0783.  It was a claims made and reported policy.  *Id.* at CS 0787 (providing coverage for damages that result from a claim "that is both first made against the 'Insured' and reported in writing to the 'Company' during the 'Policy Period'").  With certain exceptions, the policy provided coverage where an act or omission made after the retroactive date of the policy (February 1, 1995, *Id.* at CS 0786) gave rise to certain types of claims first made and reported during the policy period.

The policy defines "Claim" as:

> a demand received by the "Insured" for money or services arising out of an act or omission, including "Personal Injury," in the rendering of or failure to render "Professional Services".  A demand shall include the service of suit or the institution of mediation or an arbitration proceeding against the "Insured".

*Id.* at CS 0788.  Even if a claim is first made during the policy, the policy provides coverage only where

> prior to the inception date of the first Policy issued by the "Company" . . . no "Insured" had a basis to believe that any such act or omission or "Related Act or Omission" might reasonably be expected to be the basis of a "Claim" against an "Insured."

*Id.* at CS 0787.

**3.     Claim reported, defense denied**

Gold Mountain timely tendered the Carlsons' state court action to Century for defense and indemnity.  Gold Mountain also provided Century with the real estate file that Gold Mountain had created for the Carlsons' transactions.  Inside the real estate file was a letter written by the Carlsons, dated August 20, 2007.  *Id.* at CS 0485.  The letter requested that Prudential California attend a mediation in order to attempt to resolve a conflict, and it indicated that the Carlsons were considering making a $65,000 claim against Prudential California.  *Id.*  It was attached to a certificate of service dated August 21, 2007.  Ex. 8, CS 0486.  The certificate states that the document was served by mail, but does not say that postage was affixed.  It also lists the correct address for Prudential California, but first names the parent organization, Prudential Real Estate Affiliates, Inc.  The letter does not have a date-received stamp.

3

On October 3, 2008, Century denied coverage.  *Id.* at Ex. 13, CS 0086–0089.  Betty Low, principal of Gold Mountain, responded to the denial letter in an email that stated:

> I am responding to your letter of declining coverage for the claim I submitted regarding Ron and Marion Carlson.  I do not feel that your decision is adequate.  I do not recall receiving g [sic] the letter to mediation dated August 2007.  If I had I would of contacted my E&O company.  I am not familiar with litigation and quite intimidated by the idea someone would want to sue me or my company.  I am positive I would of contacted my carrier so that they could review the matter and advise me how to proceed.
>
> Please review my claim again and provide me with coverage.  I have been a Realtor for over 19 years and have always managed to handle my affairs in professional and ethical manner.  As per my record with the E&O companies I have had I do not take unnecessary risks.

*Id.* at Ex. 16, CS 0080.

Without further investigation into the facts of the case, defendant again denied coverage on October 27, 2008.  *Id.* at Ex. 20, CS 0148.

**4.    May 27, 2011 Order**

In May 2011, plaintiffs moved for partial summary judgment on their claim that defendant breached the duty to defend and the implied covenant of good faith and fair dealing.  On May 27, 2011, the Court issued an order (the "May 27th Order") granting in part and denying in part that motion.  The Court agreed with plaintiffs that Century had breached its duty to defend the underlying claim.  However, the Court found that plaintiffs had failed to show that there were no genuine issues of material fact regarding breach of the implied covenant.  Specifically, the Court found that there were factual questions regarding whether the settlement agreement and default judgment of over $3.3 million was reasonable and free from fraud or collusion.

Both parties now move for summary judgment on three issues left open by the May 27, 2011 Order.  These questions are: whether Century's breach of the duty to defend was unreasonable; whether Century can be liable for damages in excess of the policy coverage limits; and whether the settlement agreement and default judgment were reasonable and free from fraud or collusion.  Century also moves for summary judgment on the issue of whether it had the duty to indemnify its insureds.

4

1

**LEGAL STANDARD**

2          Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and

3   any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

4   to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).  The moving party bears the initial burden

5   of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

6   323 (1986).  The moving party, however, has no burden to disprove matters on which the non-moving

7   party will have the burden of proof at trial.  The moving party need only demonstrate to the Court that

8   there is an absence of evidence to support the non-moving party's case.  *Id.* at 325.

9          Once the moving party has met its burden, the burden shifts to the non-moving party to "set out

10  'specific facts showing a genuine issue for trial.'"  *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)).  To

11  carry this burden, the non-moving party must "do more than simply show that there is some

12  metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

13  475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there

14  must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v.*

15  *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

16         In deciding a summary judgment motion, the Court must view the evidence in the light most

17  favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id.* at 255.

18  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from

19  the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."  *Id.*

20  However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

21  genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d

22  730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)).

23

24                                        **DISCUSSION**

25  **1.     Whether Century violated the implied covenant of good faith and fair dealing**

26         Century moves for judgment on the issue of whether it breached the implied covenant of good

27  faith and fair dealing, and the related issues of punitive damages and attorney's fees.

28         In its May 27th Order, the Court found that Century breached the duty to defend its insured, but

*United States District Court*
For the Northern District of California

left open the question of whether it had done so unreasonably.  In its claim denial, Century had relied on the fact that Prudential California's real estate file for plaintiffs contained the August 20, 2007 letter, which indicated that the Carlsons were considering making a $65,000 claim against Prudential California.  Century believed the existence of this letter placed the claim outside of the scope of the policy, and that Ms. Low's denial of having received the letter did not satisfy the plaintiffs' burden to "establish" that the claim was first made during the policy period.  Century also argued that it was entitled to rely on the mail presumption that a letter properly addressed and mailed is presumed to have been received.  *See* Cal. Ev. Code § 641.  The Court disagreed, noting that "the plaintiffs' burden is merely to show that there was the *potential* for liability, by reference to facts available to the insurer at the time the insured tenders its claim for a defense."  May 27th Order at 8 (*citing National Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 499 (9th Cir. 1997)).  Plaintiffs had met that burden, the Court found, and granted summary judgment in their favor.  However, the Court denied plaintiffs' motion for summary judgment on its cause of action for breach of the implied covenant of good faith and fair dealing, finding that the reasonableness of Century's conduct was subject to factual dispute.

Century now moves for judgment on the issue.  Century claims that its denial of the claim, though now shown to be incorrect, was not unreasonable.

"[I]f [an] insurer acts unreasonably and without proper cause in failing to investigate a claim, refusing to provide a defense, or either delaying or failing to pay benefits due under the policy, [an] insured can sue in tort for breach of the covenant of good faith and fair dealing."  *Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.*, 130 Cal. App. 4th 1078, 1093 (2005).  To establish a bad faith claim, the insured must show that (1) benefits due under the policy were withheld and (2) the reason for withholding the benefits was unreasonable or without proper cause.  See *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001); *Neal v. Farmers Ins. Exchange*, 21 Cal. 3d 910, 920 (1978).  Although there is no liability where the withholding of benefits was "based on a legitimate dispute as to the insurer's liability . . . [i]n the insurance bad faith context, a dispute is not 'legitimate' unless it is founded on a basis that is reasonable under all the circumstances."  *See Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 724 n.7 (2007) (discussing allegations of delay in payment of claim).  "[T]he reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were

made; the evaluation cannot fairly be made in the light of subsequent events . . . ." *Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co.*, 90 Cal. App. 4th 335, 347 (2001).

Century argues that there was a "genuine dispute" as to whether it had a duty to defend its insureds, and therefore, its denial was not unreasonable. Def.'s MSJ at 4. It is well settled that in the context of the duty to defend, factual disputes about whether the claim falls within the scope of the policy do not relieve an insurer of its defense duty. *See Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993) ("[T]he duty may exist even where coverage is in doubt and ultimately does not develop.") Century could not rely on a factual dispute to "reasonably" deny its insured's claim. Recognizing this, Century instead argues that it relied on a reasonable interpretation of *legal* doctrine as applied to the undisputed facts. Def.'s MSJ at 5.

Though the parties debate the application of the "genuine dispute" doctrine in these circumstances, the Ninth Circuit has applied the doctrine in a duty to defend case where a legal dispute existed. *See Lunsford v. American Guar. & Liab. Ins. Co.*, 18 F.3d 653, 655 (9th Cir. 1994) (finding breach of defense duty but not of the implied covenant where, *inter alia*, "[e]ven the distinction between the two terms ["malicious prosecution" and "abuse of process"] as they are understood by lawyers and judges is less than clear"); *see also* H. Walter Croskey, et al., California Practice Guide: Insurance Litigation (The Rutter Group 2010) §§ 12:618.5, 12:618.6, 12:618.10 (while factual disputes preclude application of the 'genuine dispute doctrine' in duty to defend cases, legal disputes do not); *Gaylord v. Nationwide Mut. Ins. Co.*, 776 F. Supp. 2d 1101, 1125 (E.D. Cal. 2011) (surveying opinions that apply the genuine dispute rule in cases involving the duty to defend).

As set forth in the May 27th Order, the parties agree on the following undisputed facts: Gold Mountain and Oberg were insured by Century under a claims made and reported policy. The August 20, 2007 letter constituted a claim made. At least some portion of plaintiffs' claim constituted the type of errors or omissions covered under the E&O policy. The letter was accompanied by a certificate of service dated August 21, 2007. The certificate states that the document was served by mail, but does not say that postage was affixed. It also lists the correct address for the insured, but first names the parent organization, Prudential Real Estate Affiliates, Inc. The letter does not have a date received stamp. Also in the file was plaintiffs' draft complaint. When Century denied the insured's request for

United States District Court
For the Northern District of California

1    reconsideration on October 27, 2008, it had received Betty Low's email stating that Gold Mountain was

2    covered under another E&O Policy in August 2007.

3        While the Court found erroneous Century's belief that based on these facts it had no legal

4    obligation to defend its insured, the Court now finds that Century's position was based on an

5    interpretation of the legal standards which was not unreasonable.  As set forth in its opposition to

6    plaintiffs' motion, Century relied on (1) the mail presumption, which states "a letter correctly addressed

7    and properly mailed is presumed to have been received in the ordinary course of mail," Cal. Ev. Code

8    § 641; (2) that the proof of service created a separate, second presumption of receipt (*citing In re:*

9    *Hongisto*, 293 B.R. 45, 52 (N.D.Cal. 2003)) ("A properly addressed proof of service carries with it a

10   presumption of receipt. A party claiming non-receipt must overcome the presumption with clear and

11   convincing evidence; a simple denial of receipt is insufficient."); (3) that unlike in *National Steel*, which

12   the Court relied on in the May 27th Order, the letter was actually found in the insured's files and had

13   an accompanying proof of service, citing 121 F.3d at 498-99; (4) that the insured has an "initial burden"

14   of proving the existence of a potential for coverage, including showing that certain actions take place

15   "during the policy period," citing *Prichard v. Liberty Mut. Ins. Co.*, 84 Cal. App. 4th 890, 910 (2000));

16   and (5) that an insured cannot manufacture a dispute "by refusing to concede the truth of a fact without

17   adducing some evidentiary support for its position," citing *Montrose*, 6 Cal. 4th at 301.  Taken together,

18   while ultimately wrong, Century's position was not unreasonable.

19       Because the Court finds that Century did not act unreasonably, it GRANTS Century's motion

20   for summary judgment on plaintiffs' allegations of breach of the implied covenant of good faith and fair

21   dealing.  Because punitive damages require a greater showing than simply bad faith, *a fortiori* the Court

22   DENIES plaintiff's motion for punitive damages and GRANTS Century's motion on the issue. *See*

23   *Shade Foods, Inc. v. Innovative Prod. Sales & Marketing, Inc.*, 78 Cal. App. 4th 847, 890 (2000).

24   Attorney's fees also require a tort judgment, *see Cassim v. Allstate Ins. Co.* 33 Cal. 4th 780, 808 (2004),

25   and thus the Court GRANTS Century's motion on the absence of recovery of attorney's fees as well.

26

27

28

United States District Court
For the Northern District of California

## 2.        Whether plaintiffs' damages are limited to the policy coverage

Plaintiffs seek to recover the $3.3 million default judgment, which substantially exceeds Century Surety's $500,000 policy limits.   Century moves for summary judgment on the issue of whether plaintiffs' damages may exceed the policy coverage limits.[2]

California courts have described the difference between the damages recoverable for breach of the duty to defend and breach of the implied covenant as follows:

> Breach of an insurer's duty to defend violates a contractual obligation and, where unreasonable, also violates the covenant of good faith and fair dealing, for which tort remedies are appropriate.  Contractual damages are the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.  Tort damages are the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.

*Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054, 1061 (2010) (quotation marks and citations omitted).  Having found no breach of the implied covenant, plaintiffs are limited to contractual damages.  The question is whether contractual damages are limited to the policy coverage.

Century argues that if the Court agrees with them that its actions were not unreasonable, as it has, plaintiffs "have no basis for recovering extra-contractual tort damages of any kind."  Def.'s MSJ at 7.  Plaintiffs argue that "California does not require a showing of 'bad faith' in order to obtain consequential damages and recovery of the excess judgment.  A plaintiff can recover consequential damages and the excess judgment by proving breach of the express terms of the insurance contract."  Pl.'s Opp. at 11.

The Court agrees with plaintiffs.  Contract damages are the amount which "will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."  *Advanced Network*, 190 Cal. App. 4th at 1061.  "All the detriment proximately caused" may include excess settlements or judgments.  A judgment in excess of the policy limits is a foreseeable outcome of the breach of the duty to defend.  In the oft-cited *Amato v. Mercury Cas. Co.*, 53 Cal. App. 4th 825, 831 (1997), the court held that where an insurer tortiously

---

[2]In Section 3, *infra,* the Court finds that the settlement agreement and subsequent default judgment were the product of collusion, and therefore that Century is not liable for that judgment.  The Court will request further briefing on damages.  At this stage, the Court will only analyze the question of whether damages – should any be recoverable – are limited by the policy ceiling.

1   breaches the duty to defend, the insurer is liable for the default judgment, "which is a proximate result

2   of its wrongful refusal to defend." *Id.* While *Amato* involved a tortious breach of the duty to

3   defend, Justice Croskey, in his text on insurance coverage, has stated that

> *Amato* appears to be based on tort principles ("bad faith"). Even so, "consequential damages" should also be recoverable for breach of contract, as damages which the parties when entering into contract, contemplated as *likely to flow* from breach. A default judgment may be regarded as the "expectable result" of the insurer's breach of its duty to defend.

4

5

6

7   H. Walter Croskey, et al., California Practice Guide: Insurance Litigation (The Rutter Group 2010) §§

8   7:692.3. The Court agrees. Whether or not a breach of the duty to defend is tortious, a default judgment

9   is a foreseeable detriment proximately caused thereby. A judgment in the underlying suit bears no

10  necessary relationship to the policy coverage of the insured; therefore, it need not be limited by the

11  policy ceiling.

12      Century, to support its position, relies on a 1970 opinion that states "[n]o California case holds

13  the insurer to liability for the amount of the judgment exceeding the policy limit where its only wrong

14  is breach of the duty to defend." *State Farm. Mut. Auto Ins. Co. v. Allstate Ins. Co.*, 9 Cal. App. 3d 508,

15  528 (1970). The *State Farm* court's lengthy analysis concludes, however, that this is "usually" but not

16  inexorably true; "[d]amages for breach of the duty to defend are not inexorably imprisoned within the

17  policy limit but are measured by the consequences proximately caused by the breach." *Id.* at 529. A

18  default judgment may be proximately caused by the breach.

19      It does not follow that plaintiffs are necessarily entitled to recovery on the default judgment

20  entered in this case. In order to qualify as recoverable, the judgment must also be "not unreasonable

21  and free from fraud or collusion." *Pruyn v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500, 515 (1995).

22  This rule is especially applicable where, like here, the insured entered into an agreement to allow a

23  default judgment against it in exchange for covenant not to execute. *Id.* at 509.

24

25  **3.      Whether the default judgment is free from fraud and collusion**

26      The general rule is that an insured "who is abandoned by its liability insurer is free to make the

27  best settlement possible with the third party claimant, including a stipulated judgment with a covenant

28  not to execute. Provided that such settlement is not unreasonable and is free from fraud or collusion,

10

the insurer will be bound thereby." *Pruyn,* 36 Cal. App. 4th at 515.  This rule "exclude[s], of course, those proceedings which are clearly a patent sham collusively designed to create a judgment for which liability insurance coverage would then exist." *Id.* at 517, n. 16.

In its May 27th Order, the Court noted that,

> plaintiffs' claim ballooned from a desire to recover a $1,000 deposit, to a wish for a $5,000 recovery, to a complaint for $65,000, to a judgment for $3,334,834.61, all stemming from a real estate transaction involving a house that was once under contract to sell for $1,262,000.  Although evidence adduced at trial may well show that the agreement reached between plaintiffs and the insured was reasonable and free from fraud or collusion, when the record before the Court is viewed in the light most favorable to defendant plaintiffs are not entitled to judgment.

May 27th Order, at 11.  The Court adds the fact that the August 20, 2007 letter was found within the insured's file, and that the Court relied on the truth of Ms. Low's statement that she could not recall reading it when ruling against Century. *See* May 27th Order, at 10.  More evidence has since come to light, particularly the insured's depositions.  The Court here engages the question left open by the May 27th Order -- whether the settlement agreement and resulting judgment were reasonable, and free from fraud and collusion.

In the context of an insurer's duty to defend, *Pruyn* shaped the analysis a court should employ where a default judgment is rendered against a party in exchange for a covenant not to execute.  A settlement is entitled to an evidentiary presumption as to the amount of liability as long as the plaintiff establishes three "foundational facts": "(1) the insurer wrongfully failed or refused to provide coverage or a defense, (2) the insured thereafter entered into a settlement of the litigation which was (3) reasonable in the sense that it reflected an informed and good faith effort by the insured to resolve the claim." The court continued,

> [I]f plaintiff produces evidence of the basic or foundational facts, then the burden of proof will shift to the defendant insurers to persuade the trier of fact, by a preponderance of the evidence, that [the] settlement did not represent a reasonable resolution of plaintiff's claim or that the settlement was the product of fraud or collusion. The principles of fraud and collusion are self-evident and require no extended discussion. The facts and circumstances which will lead a court to conclude that either are present are limited only by the imagination of those who would cheat and deceive.

*Pruyn*, 36 Cal. App. 4th at 530.

Plaintiffs have established the first two foundational facts -- that the insurer wrongfully failed

11

to provide a defense, and that the insured thereafter entered into a settlement. Plaintiffs provided prima facie evidence regarding the third foundational fact -- that the settlement/judgment was informed and in good faith -- via the declarations that were attached to the settlement agreement. *See* Martini Decl., Ex. 6 (the "Settlement Agreement").

The burden thus shifts to Century to prove that the default judgment it was unreasonable, fraudulent or collusive. Def.'s MSJ at 10 (citing *Zander v. Texaco, Inc.*, 259 Cal. App. 2d 793, 804 (1968) ("[W]here fraud or collusion does appear, the insurer is not bound.")) As this is a summary judgment motion, Century's burden is high -- it must show that there are no genuine issues of material fact, and that the uncontroverted facts prove, by a preponderance of the evidence, that the settlement was unreasonable, fraudulent and collusive.

### A.    The Settlement Agreement

The Carlsons and Prudential California Realty entered into a settlement agreement, which included (and required) attached declarations from Betty Low and Julie Fox. *See* Ex. 6, Martini Decl., Doc 12. The settlement agreement includes the following statements:

> 11.This agreement is contingent upon Assigning Defendants [i.e., the insured] fulfilling to plaintiffs' satisfaction the following conditions within two (2) business days:
>
> > a. Assigning Defendants shall provide copies of all documents and correspondence in their possession between Assigning Defendants and Century Surety and AIG relating to the claim described above, including the insurance policies themselves;
> > b. Assigning Defendants shall provide executed declarations of Betty Low, Julie Fox, and Jane L. Oberg in the forms attached hereto as Exhibits A, B, and C;
> > c. Assigning Defendants will provide any additional documentation, declarations or information in their possession relating to the claim for insurance against Century Surety and AIG as the Plaintiffs, or their counsel, may reasonably request.
>
> Assigning Defendants, Betty Low and Julie Fox will meet with plaintiffs' counsel Alan L. Martini, at their office on Tennessee Street in Vallejo, California on or before May 6, 2010, and will provide the documents, declarations, and additional documentation to him at that time. *Plaintiffs have the right to review all such declarations, documentation, and other information provided by Assigning Defendants pursuant to this paragraph, and if not satisfied with said information, to cancel this agreement and rescind it ab initio.* Plaintiffs' approval of the information required by this paragraph will be signified by plaintiffs' removal of this contingency in writing within two business days of Assigning Defendants providing plaintiffs all of the information and

documentation required by this paragraph

. . .

12. Plaintiffs accept the aforementioned assignment based upon their reliance upon the declarations signed by Assigning Defendants *concerning their absence of knowledge of any claims made by plaintiffs prior to February 5, 2008.* Assigning Defendants represent and warrant that said declarations are true and accurate.

*Id.* at 5-6 (emphasis added).

Century first points to the provisions and deposition testimony that describes the Carlsons' attorney's involvement in the Settlement Agreement Declarations. The insureds could only settle the claim with the Carlsons "*if* they provided declarations which were *satisfactory* to the Carlsons' attorney." Def.'s MSJ at 12 (emphasis in original). According to Century, "Ms. Low testified that she discussed with the Carlsons' attorney, Mr. Martini, what type of information needed to be included in her declaration before it was executed, but she could not recall any specifics and she did not maintain any drafts of her declaration." *Id.* (citing Low Dep. at 115:2-116:12) ("Q: [D]id you have any discussions with Mr. Martini about what type of information needed to be included in this declaration which you then signed?" "A: Yes."). Ms. Fox, for her part, testified that she had a meeting with Mr. Martini and Betty Fox "about this settlement agreement," but does not recall the discussions at the meeting. Fox Dep., 110:13-114:10.

## B.   Declaration of Betty Low

Century argues that Low's Settlement Agreement Declaration contains several material falsehoods that were revealed in deposition. Low attested to the following facts:

3. Attached hereto as Exhibit A is a copy of a real estate Errors and Omissions application for Century Surety Insurance Company, which I signed on February 5, 2008. The statements contained therein were made by me. Where appropriate, *I took necessary steps to conduct a polling of all my employees and agents/brokers who worked at PRUDENTIAL CALIFORNIA REALTY at the time to determine the truth of any and all representations made in said application,* including whether they had received any notice or threat from any person or organization demanding money or services related to the professional services provided through my company, which could be construed as the basis of a claim or an actual claim.

4. The statements contained in the Errors and Omissions Liability Application were true, including the fact that neither I nor anyone working at

PRUDENTIAL CALIFORNIA REALTY were aware of any claims that had been made in the past five years against the firm and that no one affiliated with the firm was aware of any circumstances which may result in a claim being made against the firm.

…

11. *I have polled all the employees and agent/brokers* … and have determined that none of them were aware of or received any notices or threats, whether written or verbal, from any person or organization, including the CARLSONS, which could be construed as a basis of a claim or an actual claim as of February 5, 2008.

12. Although GOLD MOUNTAIN INVESTMENTS and its brokers and agents were insured under the AIG errors and omissions policy in effect between 1/13/07 and 1/13/08, no claims were tendered under that policy before February 5, 2008 because none, including the CARLSONS, were known by me, or the agents and brokers working at PRUDENTIAL CALIFORNIA REALTY.

Low Decl., attached to Settlement Agreement, ¶¶ 3-4, 11-12 (emphasis added).

One of the declaration's key assertions was that Low -- the principal of Gold Mountain -- had "polled" her employees about whether they were aware of any claims made in the past five years against the firm. *Id.* ¶ 3. In her deposition testimony, Low admitted to never explicitly asking her employees about whether they had "received any notices or threats from any person or organization." Ex. 47, Low Dep., at 17:6-18:18. Instead, to repeated questioning, Low answered that there were "office meetings [that] are fairly informal and, you know, we open up with what is the new business. Normally, that's how we would open the meeting and that would open the floor up for discussion for anything . . . I feel – we opened up the meetings to is [sic] there any new business, is there any concerns, what's going on out there, is an opportunity to discuss matters that would be serious like this. So, in my mind, that's sort of polling." *Id.*

The second key assertion of Low's declaration was that no claims, "including the Carlsons, were known by me." Low Decl., ¶ 12. Century argues that this statement was also belied by her deposition testimony. Low testified about a meeting that occurred between her, Julie Fox and the Carlsons ten days after cancellation of the escrow in September 2006.[3] At that meeting, Low testified that Mr. Carlson

---

[3]For context, the Court describes the underlying complaint: It alleges that Julie Fox, agent for Prudential California Realty and employee of Betty Low, procured potential buyers Alicia Powell, A & S Investment Group, Inc., and Philip Vaughn (the "Buyers") to purchase the Carlsons' home. Def.'s

was "very very angry" about the failed sale, Low Dep., 27:9; that "Julie, myself, and Alicia [broker for

the buyer] agreed to give the Carlsons $5,000 and to close the matter. And Mr. Carlson did not accept

that and felt he was entitled to a larger amount", 32:4-8. When asked "at the end of this meeting, it was

your understanding that there was a possibility that Mr. Carlson might file suit; is that correct?", Low

answered "yes." 34:22-25.

Approximately one year after the cancellation of escrow (but still prior to the inception of the

Century policy), Mr. Carlson again went to Low's office. Low Dep., 46:3-25. He asked whether the

$5,000 was still available, to which Low responded no. *Id.* Low then spoke with Fox about Mr.

Carlson's visit. Low testified as follows:

> Q: And what did you and Julie discuss after the time that Mr. Carlson came into your office when you were on your own?
> A: I brought this to Julie's attention most likely within 24 to 48 hours of Mr. Carlson's visit to the office inquiring about the $5,000. And we discussed that, at the time, the $5,000 was not enough to appease him and his wife but he came back a year later wondering if it was still available, and all the people involved on the transaction had already gone their separate ways.
> ...
> Q: Did you and Julie discuss trying to come up with the $5,000 yourselves to pay Mr. Carlson at that time?
> A: We might have discussed it but I believe we did not feel that we needed to pool any funds together between Julie, myself and the office to give the Carlsons the $5,000 that was not at the title office.
> Q: Why did you feel that you did not need to do that at that time?
> A: Because when we had that meeting on that Saturday [in September 2006], that was presented to the Carlsons as one of the options to remedy the failure of their property to sell to Mr. Vaughn, or Mr. Wright, and that after a year, he comes back asking for the money when everyone that was involved was, you know, unavailable.
> Q: Do you remember anything else about that discussion you had with Julie after Mr. Carlson visited you at the office?
> A: I believe we probably made comments about the state of mind Mr. Carlson was in and how irritated he could become if he was not satisfied. And I'm sure we discussed their divorce and perhaps why they were divorcing and the purchase that Mrs. Carlson made without the sale of the Landmark property.
> Q: During that discussion, did you and Julie mention the possibility that Mr. Carlson might sue you guys?
> A: Specifically, I do not recall a conversation regarding Mr. Carlson suing us

---

Ex. 35, at 7 ("Underlying Complaint"). It alleges that the defendants failed to inform plaintiffs that the terms defendants had negotiated for the sale of the premises to defendant buyers included an "illegal payment of money to defendant," A& S Investment Group, in the form of an illegal kickback in the amount of $200,000 when the sale closed. The lender then allegedly failed to fund the loan after discovering the "illegal payment negotiated by the defendants," but only after plaintiffs had "removed the premises from the market, vacated their home, and entered into a purchase agreement and new loan agreement for the purchase of another property." ¶¶ e-m.

1
2
3
4

> specifically but I'm sure that topic was in the conversation as perhaps Mr.
> Carlson would choose that as an option to pursue any more monetary damages
> he felt entitled to.
> Q: At the time Mr. Carlson came into your office about a year later asking
> about the $5,000 following that meeting, did you think there was a possibility
> he might sue you?
> A: Yes.

5   Low Dep., 47:20-49:14.

6          According to Century, "it is clear Ms. Low knew the Carlsons were upset with the professional

7   services provided by her office, they were demanding money from her for alleged deficiencies, that she

8   had offered a monetary settlement, and it was a real possibility that the Carlsons would file suit." Def.'s

9   MSJ at 18. This testimony, according to Century, directly contradicts her declaration testimony that "no

10  one affiliated with the firm was aware of any circumstances which may result in a claim being made

11  against the firm." Low Decl., ¶ 4.

12

13                      **C.      Declaration of Julie Fox**

14          Century argues that Fox's declaration also contains several material falsehoods. In her

15  declaration attached to the settlement agreement, Fox attested to the following facts:

16          2. As of February 05, 2008, I was not aware of any claims that had been made
            in the past five years against Prudential CA Realty[,] specifically any claim
17          being made by Ron and Marion Carlson as of that date[,] nor was I aware of any
            letters that they may have written concerning a possible claim at that time.
18
            …
19
            4. I was aware that sellers did not want the $1,000 good faith deposit after
20          cancellation of escrow and wanted instead the buyers to give them $5,000. …
            Alicia Powell informed me that sellers were claiming that false and misleading
21          statements had been made and that the transaction included an illegal payment
            of money which she said was not illegal. After this conversation, I made some
22          notes summarizing my recollection of the transaction. …

23  Fox Decl., attached to Settlement Agreement, ¶¶ 3-4, 11-12 (emphasis added). At her deposition, Fox

24  essentially stated that she could not recall any of the facts surrounding anything to do with the Carlson

25  transaction.[4] This includes not recalling ever having any discussions with the Carlsons in which they

26  _____

27          [4]As Century points out, Fox testified she could not recall the following:

28          She did not remember when she first met Marion Carlson [Ex. 49 at 12:17-13:6].

                                    16

were angry with her, "despite the testimony of Low and Powell." Def.'s MSJ at 19-20 (*citing* Fox Dep., 41:3-5, 48:13-18) ("Q: Do you recall whether or not Ron or Marion was angry with you during this meeting? A: No. They brought me doughnuts. Q: During this meeting, did Ron or Marion allege that you had done anything wrong in the transaction? A: No.")

Given this unrevealing deposition testimony, Century attacks Fox's declaration based on notes in evidence authored by her. The critical dispute is over when the notes were authored. One set of notes is six handwritten pages that appear to respond to a complaint. *See* CS 0327-0332. Fox testified that she did not recall when or why she prepared them, but they were "most likely" prepared after reviewing a lawsuit. Low Dep., 65:7-22. The parties dispute whether they were written in response to the August 2007 draft complaint enclosed with the August 2007 letter -- which would prove that Fox received the letter and was aware of a claim prior to February 2008 -- or if they were written in response to the June 2008 complaint that was actually filed in the underlying suit.

The draft notes respond in corresponding form to both complaints. For example, both the draft and filed complaints allege "a. Defendant Julie Fox made false and misleading statements," while the note states, "false misleading statements - INCORRECT." Century argues that the notes are likely responding to the draft complaint, because the filed complaint adds an allegation of "false promises," to which she did not respond.

A second set of notes matches closely to the handwritten notes. The handwritten notes state,

She did not remember when the Carlsons listed their property with her. [Ex. 49 at 14:12-24] She did not remember discussing the listing price for the Property. [Ex. 49 at 15:7-19]. She did not remember how she first found A&S as the buyer for the Property. [Ex. 49 at 16:14-17:4; 19:6-8] She did not remember if all parties were together when the purchase agreement was signed. [Ex. 49 at 17:5-18:2] She did not remember any circumstances surrounding the reduction in the purchase price after the purchase contract was signed. [Ex. 49 at 24:7-26:25] She did not recall any circumstances surrounding changing the buyer to the assignee Phillip Vaughn. [Ex. 49 at 27:1-28:5] She did not recall any discussions with the Carlsons about the demand for payment by A&S for its fee. [Ex. 49 at 28:6-29:2] She did not recall much about the extension of time addendum or appraisals for the property. [Ex. 49 at 30:22-35:24] She did not remember being advised that the deal was going to be cancelled, or the circumstances surrounding the deal falling apart. [Ex. 49 at 35:25-36:25; 39:22-40:15] She did not remember any circumstances surrounding the Carlsons' signature on the cancellation form. [Ex. 49 at 44:19-25]. She did not know when or why she wrote any of the notes in the file. [Ex. 49 at 37:1-23; 40:25-41:8; 86:23-87:25; 101:23-106:23].

"Ron Carlson solicited me, Julie Fox at one of my open houses to bring any prospects that may come to my open house to his home.  He contacted me and asked me if anyone was interested in purchasing."  CS 0331.  As Century points out, the typed notes state, "Ron Carlson solicited Julie Fox, at one of her open houses right up the street from his home.  He asked me to bring anyone who might be looking for something nicer than the home I was having the open house at as [sic] his home was much nicer with lots of upgrades."  CS 0318.  The handwritten notes state that, "A&S Investments, Alicia Powell wanted to see the home and made an offer.  I also informed her that the value was not there.  I pulled the comps and felt he wanted too much."  CS 0331.  The typed notes state that "A&S Investments, LLC made an offer and it was accepted. I also informed her that I pulled the comps and the value was not there."  CS 0318.

The purpose of Century's exercise in matching the handwritten and typed notes is to align them with a fax date at the top of the typed notes.  The top fax line on the typed copies states: "Sep 05 07 02:29p - Julie Fox".  This date, September 5, 2007, is two weeks after the Carlsons' demand letter and draft complaint were mailed to the insureds on August 21, 2007.  If that date is correct, this is proof that Ms. Fox prepared these notes (and the first draft handwritten notes) in response to reviewing the draft complaint in early September 2007.  Def.'s MSJ at 25.

### D.     Plaintiff's response

Plaintiffs respond that there remain issues of fact regarding when Betty Low and Julie Fox knew of the Carlsons' claim.  Regarding the fax date, plaintiffs argue that the date on Julie Fox's fax machine could have been incorrect, as it was a used fax machine.[5]  They also point to deposition testimony from Low that Fox's handwritten notes are the notes Low asked Fox to prepare after they were sued in the lawsuit, i.e., in 2008.  Low Dep., 102:14-103:2.  Regarding the other contentions, specifically when Low knew of the Carlsons' claim, plaintiffs rely on the Carlsons' own deposition testimony.  Mr. Carlson

---

[5]Anticipating this argument, Century shows that the fax dates on other documents from that fax machine align with the dates listed on the respective documents themselves.  The fax dates are either the day of or shortly after the signature date.  Def.'s MSJ at 25.  *See* CS 0562 (fax stamp: "Sep 01 06"; signature line, "September 1, 2006"); CS 0583-85 (fax stamp: "Aug 30 06"; signature line, "8/22/06"); CS 0639 (fax stamp: "Aug 24 06"; signature line, "8/22/06"); CS 0692-93 (fax stamp: "Jul 15 06"; signature line, "July 12, 2006").

United States District Court
For the Northern District of California

testified that neither Betty Low nor Julie Fox ever offered him $5,000 as compensation for the failed sale, 26:25-27:2.  Mrs. Carlson testified that at the Saturday meeting following the failure of the sale, "the parties didn't discuss much other than that they had signed the wrong paper and didn't mean to sign it."  M. Carlson Dep. 19:19-20:6.  Plaintiffs attempt to demonstrate that triable issues of material fact remain, which go to the question of indemnity.

Plaintiffs have a second argument regarding the declarations.  Whether or not they were false, Century "presents no cognizable causal connection between the alleged false declarations and the rendition of judgment in the underlying case for which it claims it is not liable."  Pl.'s Opp. at 16. According to plaintiffs, the declarations were important simply to evaluate whether to accept the assignment of the insured's claim against Century.  As they stated at oral argument, the declarations were conditions of the agreement, not consideration for it.  "Even if the declarations are untrue, as Century contends, there is nothing collusive or fraudulent about the settlement agreement itself.  There is no evidence that the Carlsons were in any way complicit with the preparation of any allegedly false declarations, or that they in fact required declarations which they knew to be false as a condition to the settlement agreement."  Pl.'s Opp. 16-17.  Plaintiffs also note that they did not submit the declarations to the underlying court to support the judgment.  Pl.'s Opp. at 17.

Century argues this is a "ridiculous and circular position."  Def.'s Reply at 15.  Century contends that the very existence of the judgment in the underlying case was predicated on receipt of the declarations.  "The declarations were the consideration given by the Insureds for the Carlsons to settle the case in exchange for an assignment of rights."  *Id.*  Century points out that the insureds had defended themselves following the filing of the First Amended Complaint by filing an answer in pro per. According to Century, the insureds agreed not to file an answer to the Second Amended Complaint because of the settlement agreement, and the settlement agreement would not have been executed but for the provision of "satisfactory" declarations to the Carlsons.  *Id.*  The judgment, therefore, arose from the collusion.  *Id.* (*citing Andrade v. Jennings*, 54 Cal. App. 4th 307, 331 (1997)).

**E.     Analysis**

After review of the evidence, the Court finds that Century has met its burden on summary

United States District Court
For the Northern District of California

1    judgment of proving by a preponderance of the evidence that the agreement was collusive.  Under

2    California law, collusion has been variously defined as "(1) a deceitful agreement or compact between

3    two or more persons, for the one party to bring an action against the other for some evil purpose, as to

4    defraud a third party of his right"; (2) "a secret arrangement between two or more persons, whose

5    interests are apparently conflicting, to make use of the forms and proceedings of law in order to defraud

6    a third person, or to obtain that which justice would not give them, by deceiving a court or its officers";

7    and (3) "a secret combination, conspiracy, or concert of action between two or more persons for

8    fraudulent or deceitful purposes." *Andrade v. Jennings*, 54 Cal. App. 4th 307, 331 (1997) (*citing Span,*

9    *Inc. v. Associated Internat. Ins. Co.*, 227 Cal. App. 3d 463, 484 (1991)).  In the insurance context,

10   "collusion occurs when the insured and the third party claimant work together to manufacture a cause

11   of action for bad faith against the insurer or to inflate the third party's recovery to artificially increase

12   damages flowing from the insurer's breach." *Safeco Ins. Co. of Am. v. Parks*, 170 Cal. App 992, 1013

13   (2009).

14         The Court finds dispositive the following uncontroverted facts. Low admitted that there was a

15   possibility the Carlsons would sue after the 2006 meeting.  Low Dep. 34:22-25.  She also admitted

16   knowing there was a possibility the Carlsons would sue after the 2007 meeting.  Low Dep., 47:20-49:14.

17   Low also discussed with Fox the possibility of settling with the Carlsons for $5,000.  Low Dep., 47:20-

18   49:14, 145:18-1469.  Though Fox claimed not to recall nearly anything to do with the transaction, the

19   weight of the evidence shows that she knew of the Carlsons' claim as well.  She attended the meetings

20   in which Carlson demanded money. *See* Fox Dep., 41:3- 48:18.  The notes she wrote track the draft

21   complaint, and the typed notes are stamped with a 2007 date.  The other documents in evidence with

22   the same fax stamp correspond to the signature dates on those documents.  Moreover, it remains true

23   that the August 2007 letter was found in the file.[6]  The evidence shows that the insureds knew of the

24   _____

25         [6]The Court recognizes that whether the fax machine's date stamp is actually correct, and whether
      the August 2007 letter was actually read prior to February 2008, are both disputed facts.  However, it
26    is uncontroverted that the stamp exists and says 2007, and that the letter was found in the file.  The
      difference is important.  Based on the uncontroverted facts, Century has proven by a preponderance of
27    the evidence that the agreement was collusive.  The controverted evidence merely provides further
      support for Century's claim, while no controverted facts provide support for plaintiffs' claims.  Thus
28    even were plaintiff successful in disputing some of the evidence, Century still would have proven by

United States District Court
For the Northern District of California

1    claim prior to inception of the Century policy.[7]

2          As for the Carlsons, the uncontroverted facts prove by a preponderance of the evidence that they

3    colluded with the underlying defendants.  They, of course, were the ones making the claim throughout.

4    Mr. Carlson repeatedly demanded money from the underlying defendants.  CS 0329.  He hired an

5    attorney and  caused the August 2007 letter to be mailed.  R. Carlson Dep., 29:23-30:5.  Mr. Carlson

6    admitted at deposition that one of the addressees, First American Title, received the letter and contacted

7    him to discuss it further.  *Id.*, 38:4-25.  The evidence thus demonstrates that both parties to the

8    settlement agreement knew the Carlsons had first made the claim prior to the inception of the policy.

9    Despite this, the settlement agreement was conditioned on sworn declarations by the insured and

10   provided to the Carlsons that stated the insured were unaware of the Carlsons' claim prior to February

11   5, 2008.  *See* Settlement Agreement, ¶ 11 (Ex. 6, Martini Decl., Doc. 12).  Furthermore, the declarations

12   were only signed after the insured met with plaintiffs's attorney and discussed "what type of information

13   needed to be included in [the] declaration."  *See*, *e.g.,* Low Dep. 115:9-19, 86:3-89:19.  Plaintiffs

14   maintained  the right to cancel the settlement agreement if the declarations proved to be unsatisfactory.

15   *See* Sett. Agreement, ¶ 11.

16         Other facts regarding the settlement and judgment indicate that they were collusive.  In

17   determining whether a settlement is made in good faith, a fact finder may take into account "the amount

18   of the overall settlement in light of the value of the case; . . . the facts known to the settling insured at

19   the time of the settlement; the presence of a covenant not to execute as part of the settlement; and the

20   failure of the settling insured to consider viable available defenses."  *Andrade*, 54 Cal. App. 4th at 331

21   (surveying opinions).  Every  one of these factors counsels a finding that the settlement agreement and

22   resulting default judgment were made in bad faith.  The Carlsons' claim skyrocketed from a draft

23   complaint alleging damages in the vicinity of $70,000 to a $3.3 million default judgment.  The facts

24   known to the settling insured included the repeated demand for money from Mr. Carlson.  There is a

25

26   _____

27   a preponderance of the evidence that the agreement was collusive.

28         [7]Because of this, Century had no duty to indemnify the underlying defendants for the claim.
     Century's motion on the issue of indemnity is therefore GRANTED.

covenant not to execute as part of the settlement.  And the settling insured dropped any viable defenses in exchange for the covenant not to execute, and allowed a default judgment to be entered against it. None of these facts are disputed.[8]

In sum, the Court finds that the settlement agreement and the resulting default judgment were the products of collusion.  Under the *Pruyn* rule, an insurer is only bound by a stipulated judgment accompanied by a covenant not to execute if the settlement is reasonable and free from fraud or collusion.  36 Cal. App. 4th at 508.  Because the Court finds that the agreement and judgment are the product of collusion, Century is not bound by it.  *See also Zander,* 259 Cal. App. 2d at 804.

The question remains what damages, if any, Century is liable for owing to its breach of the duty to defend.  The *Andrade* court found that because the agreement was collusive, the plaintiffs were not entitled any recovery from the insurer.  However, there, unlike here, the court had not found that the insurer had breached its duty to defend.

The Court therefore requests guidance from the parties as to the appropriate next step in this litigation.  The parties may submit briefing regarding damages on the breach of the defense duty to the Court by **Friday, March 9, 2012**.

---

[8]A similar situation was faced by the California Court of Appeal, Fourth District, in *Andrade v. Jennings*.  54 Cal. App. 4th at 331.  There, the insured settled for $1.5 million on a claim they previously estimated was worth $200,000 in order to implicate an "excess policy" that covered damages over $1 million, after the primary insurer (for claims under $1M) went bankrupt.  The insured and the injured party negotiated a settlement agreement in which the insured agreed to the inflated amount in exchange for a covenant not to execute.  The court upheld a finding of collusion based on the amount of the settlement, the lack of defenses at the prove-up hearing, the failure to inform the hearing's magistrate of the covenant, the failure of the insured's counsel to inform the insurer of the settlement negotiations and agreement.  *Id.* at 330-335.

The Carlsons attempt to distinguish *Andrade* on the basis that there, the insurer had not breached its duty to defend.  They cite a footnote in *Andrade* quoting *Pruyn*, which states that an insurer that abandoned its insured should not be heard to complain or allowed to relitigate the trial court's judgment, i.e., the prove-up hearing amount.  36 Cal. App. 4th at 516.  *Andrade* discusses this principle, however, with respect to the separate issue of whether the insurer may attack the underlying judgment in the first place, not whether collusion is more or less likely between the injured party and the insured simply because the insurer failed to defend.  The question of collusion is not directly related to whether or not an insurer breached its duty to defend.  On the separate issue of whether Century may attack the underlying judgment as collusive, it clearly may.  *See Sunseri v. Camperos Del Valle Stables*, 185 Cal. App. 3d 559, 561-62 (1986). (finding the proper forum to determine whether the judgment is the product of fraud or collusion is in the assignee plaintiff's lawsuit against the insurer).

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiff's motion for summary judgment that its recovery is not necessarily limited by the policy ceiling; it DENIES on all other issues. The Court GRANTS defendants' motion for summary judgment that its breach of the defense duty was not unreasonable, that it is not liable for punitive damages or attorney's fees, and that the settlement agreement was collusive.


**IT IS SO ORDERED.**


Dated: February 23, 2012

_____
SUSAN ILLSTON
United States District Judge