IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RON CARLSON & MARION BENJAMIN CARLSON,

        Plaintiffs,

  v.

CENTURY SURETY CO.,

        Defendant.

        /

No. C 11-00356 SI

**ORDER UPON RECONSIDERATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING REQUEST FOR DAMAGES**

There are two issues remaining in this case. One is a motion for reconsideration on the issue of collusion between the plaintiffs and the underlying insured; the second is the issue of damages. This order resolves both issues.

**BACKGROUND**

This is an action for failure to defend and failure to indemnify on a real estate errors and omissions ("E&O") liability policy. Plaintiffs Ron Carlson and Marion Benjamin Carlson ("the Carlsons") have brought an action for declaratory relief, breach of contract, and breach of the covenant of good faith and fair dealing. The Carlsons are suing under an assignment of rights from Gold Mountain Investments, Inc. dba Prudential California Realty ("Gold Mountain") and Jane Lyla Oberg (collectively, the "insured"), who were insured by defendant Century Surety Co. ("Century"). The Carlsons allege that defendant Century refused to defend its insured in a state court suit brought by the Carlsons against the insured, Betty Low and Julie Fox, both employees of Gold Mountain (collectively, the "underlying defendants"). Following a settlement between the Carlsons and the insured (the "Settlement Agreement"), in which an assignment of rights and an agreed-upon default judgment was given to the Carlsons in exchange for a covenant not to execute on that judgment, the Carlsons brought this suit against Century.

**1.     The underlying claim**

The Carlsons listed their home for sale with Gold Mountain. On July 18, 2006, the Carlsons entered into a sale agreement for $1,262,000 with Philip Vaughn, through Mr. Vaughn's broker, Alicia Powell. Exhibits in Support of Def.'s Oppo. to Mot. for Partial Summ. J. ("Def. Exs."), Ex. 8, CS 0337; Powell Decl. ¶ 2. By September 1, 2006, the sale fell through, and on that date the purchaser signed papers releasing a $1,000 deposit to plaintiffs, which the Carlsons signed as well. *See id.*, CS 0336. According to notes authored by Julie Fox, a real estate agent with Gold Mountain, the Carlsons returned to the real estate office and wrote on the papers that they had been signed in error. *Id.* The notes state that the Carlsons wanted $5,000 rather than $1,000. *Id.* at CS 0329. By July 2007, it became clear that the $1,000 had never been deposited in escrow. *Id.* at CS 0333.

The Carlsons filed suit against Gold Mountain in the Superior Court of California in San Francisco on June 10, 2008, demanding over $65,000 in damages. *Id.* at CS 0268–0287. In May 2010, the Carlsons entered into a settlement agreement with Gold Mountain, in which, among other things, Gold Mountain and Oberg agreed to allow a default judgment to be entered against them. Decl. of Alan L. Martini in Supp. of Pl. Mot. for Partial Summ. J., Ex. 6, at 2. The Carlsons promised not to execute n the judgment against Gold Mountain or Oberg. *Id.* Gold Mountain assigned the Carlsons all of their claims and causes of action against Century. *Id.*

On January 21, 2011, the Superior Court entered default judgment in favor of the Carlsons in the amount of $3,334,834.61. Martini Decl., Ex. 7, at 2. Century has been unable to obtain a copy of the transcript from this "prove up" hearing.

**2.     The insurance policy**

Gold Mountain/Prudential California was the named insured on an E&O policy issued by Century with a policy period from February 1, 2008 until February 1, 2009. Def. Ex. 22, CS 0783. It was a claims made and reported policy. *Id.* at CS 0787 (providing coverage for damages that result from a claim "that is both first made against the 'Insured' and reported in writing to the 'Company' during the 'Policy Period'"). With certain exceptions, the policy provided coverage where an act or omission made after the retroactive date of the policy (February 1, 1995, *Id.* at CS 0786) gave rise to certain types of

2

claims first made and reported during the policy period.

The policy defines "Claim" as:

> a demand received by the "Insured" for money or services arising out of an act or omission, including "Personal Injury," in the rendering of or failure to render "Professional Services". A demand shall include the service of suit or the institution of mediation or an arbitration proceeding against the "Insured".

*Id.* at CS 0788. Even if a claim is first made during the policy, the policy provides coverage only where

> prior to the inception date of the first Policy issued by the "Company" . . . no "Insured" had a basis to believe that any such act or omission or "Related Act or Omission" might reasonably be expected to be the basis of a "Claim" against an "Insured."

*Id.* at CS 0787.

### 3.  Claim reported, defense denied

Gold Mountain tendered the Carlsons' state court action to Century for defense and indemnity on September 10, 2008. Gold Mountain also provided Century with the real estate file that Gold Mountain had created for the Carlsons' transactions. Inside the real estate file was a letter written by the Carlsons, dated August 20, 2007. *Id.* at CS 0485. The letter requested that Gold Mountain attend a mediation in order to attempt to resolve a conflict, and it indicated that the Carlsons were considering making a $65,000 claim against Gold Mountain. *Id.* It was attached to a draft complaint, as well as a certificate of service dated August 21, 2007. Ex. 8, CS 0486. The certificate states that the document was served by mail, but does not say that postage was affixed. It also lists the correct address for Gold Mountain, but first names the parent organization, Prudential Real Estate Affiliates, Inc. The letter does not have a date-received stamp.

On October 3, 2008, Century denied coverage on the basis that the insured received the claim prior to the inception of the policy. *Id.* at Ex. 13, CS 0086–0089. Century pointed to the August 2007 letter and draft complaint, and noted that the policy incepted thereafter, on February 1, 2008. Betty Low, principal of Gold Mountain, responded to the denial letter in an email stating that she had no recollection of having received the letter or draft complaint. *Id.* at Ex. 16, CD 0080. Defendant again denied coverage on October 27, 2008. *Id.* at Ex. 20, CS 0148.

3

**4. May 27, 2011 Order**

The instant lawsuit for failure to defend and failure to indemnify was filed against the insurance carrier on January 25, 2011, four days after plaintiffs obtained the $3.3 million default judgment. On March 24, 2011, plaintiffs moved for partial summary judgment on their claim that defendant breached the duty to defend and the implied covenant of good faith and fair dealing. On May 27, 2011, the Court issued an order (the "May 27th Order") granting in part and denying in part that motion. The Court agreed with plaintiffs that Century had breached its duty to defend the underlying claim. However, the Court found that plaintiffs had failed to show that there were no genuine issues of material fact regarding the implied covenant. Specifically, the Court found that there were factual questions regarding whether the settlement agreement and default judgment of over $3.3 million was reasonable and free from fraud or collusion, as required by *Pruyn v. Agricultural Ins Co.*, 36 Cal. App. 4th 500, 515 (Ct. App. 2nd 1995).

**5. February 23, 2012 Order**

In January 2012, the parties filed cross-motions for summary judgment. *See* Doc. 64 (the "Feb. 23rd Order"). The questions presented were whether Century's breach of the duty to defend was unreasonable; whether Century could be liable for damages in excess of the policy limits; and whether the settlement agreement and default judgment were reasonable and free from fraud and collusion. On February 23, 2012, the Court issued its Order granting in part and denying in part both parties' motions for summary judgment. The Court found that Century's breach of the duty to defend was not unreasonable, but that it could nonetheless be held liable for consequential damages in excess of the policy limits. The Court also found, however, that the Settlement Agreement and subsequent default judgment were the products of collusion.

On the issue of collusion, the Court analyzed the evidence provided by the parties, including the Settlement Agreement, in which the insureds assigned the rights to sue Century to the Carlsons; the declarations attached to the Settlement Agreement; the documents found in the insured's file for the Carlsons; and the deposition testimony of Betty Low and Julie Fox. *See* Feb. 23rd Order, 10:25-22:15. As discussed in more detail in that Order and *infra*, the Court found that the uncontroverted facts proved

4

by a preponderance of the evidence that Betty Low and Julie Fox were aware of the Carlsons' claim prior to the inception of the policy. *Id.*, 12:12-18:16. Despite this, Betty Low and Julie Fox signed declarations attached to the Settlement Agreement which stated otherwise -- i.e., that they were unaware of any claim made against Gold Mountain prior to the inception of the policy. *Id.*, 13:20-17:4.

The Court also found, based on what the Court stated were undisputed facts, that the Carlsons were aware of the falsity of the declarations. The Court stated that the Carlsons "were the ones making the claim throughout," that "Mr. Carlson repeatedly demanded money from the underlying defendants," that Mr. Carlson had caused the August 2007 letter to be mailed through his attorney, and that he was aware at least one of the addressees had received the letter. *Id.*, 21:2-7. Regarding its finding that the Carlsons were "the ones making claims throughout," the Court was referencing, in part, its earlier finding that the Carlsons had gone to the insureds' office and demanded $5,000, rather than the original escrow amount of $1,000, after the sale fell through. *Id.,* 2:12; May 27th Order, 11:21-22. The Court concluded that the undisputed evidence "thus demonstrates that both parties to the settlement agreement knew the Carlsons had first made the claim prior to the inception of the policy." *Id.* 21:7-8. The Court continued:

> Despite this, the Settlement Agreement was conditioned on sworn declarations by the insured and provided to the Carlsons that stated the insured were unaware of the Carlsons' claim prior to February 5, 2008. *See* Settlement Agreement, ¶ 11 (Ex. 6, Martini Decl., Doc. 12). Furthermore, the declarations were only signed after the insured met with plaintiffs' attorney and discussed "what type of information needed to be included in [the] declaration." *See, e.g.*, Low Dep. 115:9-19, 86:3-89:19. Plaintiffs maintained the right to cancel the settlement agreement if the declarations proved to be unsatisfactory.

*Id.*, at 21:16-22:3 (emphasis added). The Court concluded that the settlement and resulting default judgment were collusive, and that under controlling authority, Century was therefore not bound by the judgment. *Id.*, 22:5-7 (*citing Pruyn v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500, 508 (Ct. App. 2nd 1995).

The Court left open the question of what damages, if any, Century is liable for owing to its breach of the duty to defend. The parties then briefed that issue, and the Court addresses it later in this order.

5

**6.       The Carlsons' motion for reconsideration**

Along with briefing the issue of damages, the Carlsons filed a motion for leave to file a motion for reconsideration. *See* Doc. 69. The major thrust of the motion was that this Court erred in finding that the Carlsons were aware that the insured's sworn declarations attached to the Settlement Agreement were false. The Carlsons attached their own declarations, stating that they had never made a claim against the insured outside of the August 2007 letter, and that they believed Betty Low, Julie Fox, and Jane Oberg when they stated in their declarations that the were unaware of that or any other claim. *See* Docs. 70 and 71.

The Court had stated in its February 23, 2012 Order that it was "undisputed" that "Mr. Carlson repeatedly demanded money from the underlying defendants." From the recently submitted declarations, it now appears that this fact is actually disputed by the Carlsons. The Court therefore granted leave to file a motion for reconsideration on the issue. The parties have briefed that issue, and the Court addresses it in this order.

**LEGAL STANDARD**

Civil Local Rule 7-9 allows for motions for reconsideration with the leave of the Court. Rule 7-9(b) requires that the moving party show:

> (1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or
>
> (2) The emergence of new material facts or a change of law occurring after the time of such order; or
>
> (3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

The Rule prohibits repetition of arguments made by the applying party in opposition to the interlocutory order which the party now seeks to have reconsidered. Civ. L. R. 7-9(c).

**DISCUSSION**

**1.     Motion for reconsideration**

  **A.     Collusion**

  The Court found that the undisputed facts proved by a preponderance of the evidence that the Carlsons and the insured had wrongfully colluded in the formation of the Settlement Agreement.[1] The Court found false the insureds' declarations that they were unaware of any claims made by the Carlsons prior to the inception of the policy. The Court also found that the Carlsons were aware of the falsity of the declarations. In so finding, one of the facts the Court relied on was that the Carlsons had made demands for money from the insured, other than the August 2007 letter, prior to the inception of the policy. Given the nature of mail delivery, the Carlsons could reasonably have claimed that they were unaware whether the insureds actually received the August 2007 letter and draft complaint. However, they could not similarly have claimed that they were unaware of the insureds' knowledge of the Carlson's own in-person demands for money. It is axiomatic that an in-person demand for money bestows on both parties knowledge of a claim.[2] In finding collusion, the Court cited the "undisputed" fact that the Carlsons had made such a demand when they went to the insured's real estate office on at least one occasion and demanded $5,000 after the underlying sale fell through. May 23rd Order 2:12; May 27th Order, 11:21-22. The Court found that because both parties were aware of the pre-inception claims, the crafting and acceptance of the false declarations was a collusive act designed to manufacture coverage where none otherwise existed.

---

[1] In their motion for reconsideration, the Carlsons also argue that the Court applied the wrong standard to the Century's motion for summary judgment, because, in one section, the Court stated that, "the Court finds that Century has met its burden on summary judgment of proving by a preponderance of the evidence that the agreement was collusive." Feb. 23rd Oder, 19:28-20:1. The Carlsons argue that this is the wrong standard because summary judgment requires finding no genuine issue of material fact. However, the quoted statement followed the Court's earlier complete description of the applicable standard: "As this is a summary judgment motion, Century's burden is high – it must show that there are no genuine issues of material fact, and that the uncontroverted facts prove, by a preponderance of the evidence, that the settlement" was unreasonable, fraudulent, or collusive. *Id.*, 12:7-10. This is the correct standard. While the Court did not restate it fully in the sentence quoted by the Carlsons, it was the standard the Court applied.

[2] As noted above, a "Claim" under the policy is defined as "a demand received by the 'Insured' for money or services arising out of an act or omission . . . in the rendering of or failure to render 'Professional Services.'"

7

There is no question that the Carlsons were aware they had made a claim -- Ron Carlson had caused to be mailed the August 2007 letter and draft complaint. R. Carlson Dep., 29:23-30:5. However, if the Carlsons could reasonably argue that they were unaware that the insureds knew of the claim, the Carlsons could also argue that they were unaware that the declarations were false. Because collusion requires a "deceitful agreement," the Carlsons' arguable ignorance of the false nature of the declarations would absolve them from collusion. *See Andrade v. Jennings*, 54 Cal. App. 4th 307, 331 (1997) (collusion is "a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third party of his right.").

After review of the Carlsons' newly attached declarations and the Carlsons' prior deposition testimony, the Court finds that it erred in characterizing the existence of the Carlsons' in-person demands for money as "undisputed." Those demands are, in fact, disputed by the Carlsons. To be sure, the bulk of the undisputed evidence supports that such demands were made.[3] Julie Fox's typed notes (bearing a pre-inception fax date stamp of September 5, 2007) state that "Ron and Marion Carlson came in to sign the release on 9/17 . . . The following day Ron Carlson called me to meet him at the office . . . He then took the original and said he wanted $5,000." Century Ex. 8, CS 0319. An undated, handwritten version of those notes states that:

> After the property didn't appraise, the buyer and seller signed cancellation of escrow and deposit was to go to sellers. Sellers signed on 9/1/2 and on 9/2/2 [sic] called me to meet them at the office. Marion brought me doughnuts and Ron wanted the form back. I made a copy, showed him the form and he wrote all over the sides of it saying he signed it in error. That stmt [statement] is false. He and Marion were both fully informed as to what they were signing and Ron is a person who reads everything before he signs. He took the original from me but I was able to make a copy of his changes before he took it. He said he didn't want $1,000. He wanted $5,000. Almost a year later he comes to the office asking about the deposit.

*Id.* at CS 0329. Julie Fox's deposition testimony supports this documentary evidence. She testified Ron Carlson had requested money from her at the September meeting following the cancellation of escrow. Fox Dep., 52:4-54:23 ("And what do you rememebr about the discussion with Ron during that subsequent meeting with Betty at the office?" "That he didn't want 1,000. He wanted 5,000.").

---

[3]Though the Court finds the existence of the Carlsons' in-person demands a disputed issue for the purposes of collusion, the Court addresses the evidence here due to its relevance to the discussion regarding fraud below.

8

Betty Low's testimony likewise supports the evidence that the Carlsons made such demands. As set forth in the Court's Feb 23rd Order, Low testified about the meeting that occurred between her, Julie Fox and the Carlsons ten days after the cancellation of the escrow in September 2006. At that meeting, Low testified that Ron Carlson was "very very angry" about the failed sale. Low Dep., 27:9. She further stated that "Julie, myself, and Alicia [broker for the buyer] agreed to give the Carlsons $5,000 and to close the matter. And Mr. Carlson did not accept that and felt he was entitled to a larger amount." *Id.*, 32:4-8. When asked, "At the end of this meeting, it was your understanding that there was a possibility that Mr. Carlson might file suit; is that correct?", Low answered "yes." *Id.*, 34:22-25. Low also testified that Ron Carlson approached the insured one year after the failure of the sale to again demand money:

> Q: Okay. After the Saturday meeting [after the sale fell through], you testified that Mr. Carlson called you approximately two days later. Following that phone call, did you have any further contact with the Carlsons?
>
> A: I believe approximately one year after the cancellation of the escrow and perhaps the cancellation of our listing agreement with the Carlsons, Mr. Carlson came to my office by himself. And I believe it was a weekend also, and I was the only one in the office, and he asked me whether or not the $5,000 was still available to give to him and our response was 'No.'

Low Dep., 46:3-46:15. When the Carlsons' attorney attempted to steer Low to agreeing that she had not received a claim from the Carlsons' until the 2008 lawsuit, Low responded as follows:

> Q: [I]s it fair to say that the first time you learned that the Carlsons were demanding money or services from your company was when you were served with a lawsuit in 2008?
>
> A: Prior to us being served the lawsuit, *Mr. Carlson had asked for money from me* on one – one day at the office.
>
> Q: This was the $5,000?
>
> A: Yes.
>
> Q: Did you understand that he was asking that that money be paid by the buyer, Alicia or Mr. Vaughn?
>
> A: The way Mr. Carlson proposed him receiving the $5,000 was not indicated as to any particular person. It was just, "Is the $5,000 still available?" And in my opinion, I don't think he cared where it came from.

*Id.*, 145:3-146:9. This documentary and testimonial evidence supports Century's claim that the Carlsons made in-person demands for money from the insured prior to the February 2008 inception of the policy.

9

The Carlsons dispute this testimony and the conclusions that Century draws from it. In his attached declaration, Ron Carlson states:

> I have reviewed the depositions of Betty Low and Julie Fox and categorically state that I did not demand $1,000 or $5,000 ever from any of them. I had one meeting with Julie Fox after escrow was supposed to close at the beginning of September 2006. Betty Low was not at that meeting, although my ex-wife, Marion Carlson was. The meeting was pleasant, I made no threatening statements or demands for money or services and merely wanted to retrieve a contract document that I and Marion Carlson had signed in error the day before.

*See* Doc. 70, R. Carlson Decl., ¶ 8. Ron Carlson also testified that the 2007 meeting that Low testified to, wherein he returned to the Gold Mountain office and demanded $5,000, never occurred. R. Carlson Dep., 27:22-28:1 ("So after the September 2nd [2006] meeting with Julie Fox in the office, what was the next interaction you had with anyone connected to the failed sale of the 1904 Landmark property?" "None."). Finally, the Carlsons point to Low and Fox deposition testimony that suggests that even if the Carlsons made claims, such claims were directed at Alicia Powell, the broker for the buyer, and not Low or Fox. Pl.'s Reply at 4-7 (*citing* Fox. Dep. at 55:6-23 ("Who did [Ron Carlson] want to pay the $5,000?" "Alicia."")).[4]

In sum, in its February 23, 2012 Order, the Court characterized as "undisputed" a fact that was actually in dispute -- that is, whether the Carlsons made in-person demands from the insured. That was a fact material to the Court's conclusion that the Carlsons were aware that the insured provided false declarations along with the Settlement Agreement. In order to grant summary judgment, there must be no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Therefore, the Court erred in granting summary judgment on the issue of collusion.

**B.     Fraud**

However, the Court finds that there are independent grounds supporting summary judgment for

---

[4]This latter theory is contradicted by Low's testimony, in which she stated, "Prior to us being served the lawsuit, Mr. Carlson had asked for money *from me* on one – one day at the office . . . The way Mr. Carlson proposed him receiving the $5,000 was not indicated as to any particular person. It was just, 'Is the $5,000 still available?' And in my opinion, I don't think he cared where it came from." Low Dep., 145:3-146:9. It is also contradicted by the August 2007 letter and draft complaint naming Low, Fox, and Gold Mountain as defendants along with Alicia Powell. *See* CS 0490.

10

1 Century on the issue of whether the default judgment is enforceable against Century. In *Pruyn v.*
2 *Agricultural Ins Co.*, 36 Cal. App. 4th 500, 515 (Ct. App. 2nd 1995), the court approved of the
3 mechanism whereby an abandoned insured assigns to an injured plaintiff the insured's rights to sue its
4 insurer, in exchange for a stipulated judgment with a covenant not to execute on that judgment. The
5 *Pruyn* court cautioned that a judgment will be enforceable only where "such settlement is not
6 unreasonable and is free from fraud or collusion." 36 Cal. App. 4th at 515. Stated another way, in order
7 for the judgment to be enforceable against the insurer, it must be 1) reasonable, 2) free from fraud, *and*
8 3) free from collusion. Here, the Court did not need to find the Settlement Agreement collusive; the
9 false declarations were enough to render the agreement fraudulent.

10 As set forth above, the undisputed documentary and testimonial evidence proved by a
11 preponderance of the evidence that Low and Fox knew a claim had been made against them. Beyond
12 Low's and Fox's testimony and Fox's notes was the August 2007 demand letter and draft complaint sent
13 by Ron Carlson. It is undisputed that the letter was found in the Carlsons' real estate file. *See* CS
14 0485-0499. Moreover, Julie Fox's notes show that she read the complaint. Her handwritten notes
15 clearly respond to a complaint, and the typed notes correspond to the handwritten notes. *Compare* CS
16 0327-0332 *and* CS0318-319.[5] While the Carlsons offer that the notes may be in response to the
17 September 2008 complaint actually filed in this case, the typed notes contain a fax line that states: "Sep
18 05 07 0:229p - Julie Fox."[6] This date, September 5, 2007, is two weeks after the Carlsons demand letter
19 and draft complaint were mailed to the insureds on August 21, 2007. It is also six months before the
20 policy incepted.

21 In direct contradiction to the undisputed evidence that the insureds were aware of the Carlsons'
22 claim prior to the inception of the policy, in exchange for a covenant not to execute, the insureds signed

---

24 [5]See Feb. 23rd Order, 17-18, for further analysis of the notes.

25 [6]The Carlsons suggest that the fax line might be incorrect, Pl.'s Opp. to Def.'s MSJ, at 28;
26 however, as noted in the Feb. 23rd Order, the fax dates on other documents from that fax machine align with the dates listed on the respective documents themselves. The fax dates are either the day of or
27 shortly after the signature date. Def.'s MSJ at 25. *See* CS 0562 (fax stamp: "Sep 01 06"; signature line, "September 1, 2006"); CS 0583-85 (fax stamp: "Aug 30 06"; signature line, "8/22/06"); CS 0639 (fax
28 stamp: "Aug 24 06"; signature line, "8/22/06"); CS 0692-93 (fax stamp: "Jul 15 06"; signature line, "July 12, 2006").

11

declarations stating they were not aware of any circumstances that might even become a claim. Betty Low's Settlement Agreement declaration states:

> 4. The statements contained in the Errors and Omissions Liability Application were true, including the fact that neither I nor anyone working at PRUDENTIAL CALIFORNIA REALTY were aware of any claims that had been made in the past five years against the firm and that no one affiliated with the firm was aware of any circumstances which may result in a claim being made against the firm.
>
> . . .
>
> 11. I have polled all the employees and agent/brokers . . . and have determined that none of them were aware of or received any notices or threats, whether written or verbal, from any person or organization, including the CARLSONS, which could be construed as a basis of a claim or an actual claim as of February 5, 2008.

Low Decl., attached to Settlement Agreement, ¶¶ 4, 11; *compare, e.g.,* Low Dep. 49:7-11 ("At the time Mr. Carlson came into your office asking about the $5,000 following that meeting, did you think there was a possibility he might sue you?" "Yes.")  Julie Fox's declaration states:

> 2. As of February 5, 2008, I was not aware of any claims that had been made in the past five years against Prudential CA Realty, specifically any claim being made by Ron and Marion Carlson as of that date, nor was I aware of any letters that they may have written concerning a possible claim at that time.

Fox Decl., attached to Settlement Agreement, ¶ 2; *compare, e.g.,* Fox Dep., 52:4-54:23 ("And what do you remember about the discussion with Ron during that subsequent meeting with Betty at the office?" "That he didn't want $1,000. He wanted $5,000.")

The Court finds that the undisputed facts prove, by a preponderance of the evidence, that these declarations were false. Moreover, the Court finds that the false declarations render the Settlement Agreement fraudulent.[7] Century was liable for coverage "for acts or omissions in the performance of professional services," provided that, prior to the inception of the policy, "no insured had a basis to believe that any such act or omission, or related act or omission, might reasonably be expected to be the basis of a Claim against the insured." *See* CS 0787. According to their undisputed testimony, both Low

---

[7]The *Pruyn* court does not define fraud in this context. Instead, the court states that, "the principles of fraud and collusion are self-evident and require no extended discussion. The facts and circumstances which will lead a court to conclude that either are present are limited only by the imagination of those who would cheat and deceive." *Pruyn*, 36 Cal. App. 4th at 530. To the same effect, see *Continental Casualty Co. v. Westerfield*, 961 F. Supp. 1502, 1505 (D. N. Mex. 1997).

and Fox reasonably believed a claim had been made, and, in fact, a claim had been made. The declarations were therefore false, and helped manufacture coverage where none would otherwise exist.

The *Pruyn* court, in approving the exchange of a stipulated or default judgment for an assignment of rights and covenant not to execute, warned that "a stipulated or consent judgment which is coupled with a covenant not to execute against the insured brings with it a high potential for fraud or collusion. With no personal exposure the insured has no incentive to contest liability or damages. . . [A] stipulated judgment should only bind an insurer under circumstances which protect against the potential for fraud and collusion." *Pruyn*, 36 Cal. App. 4th at 518 (citations omitted). The Court finds that the provision of false declarations that manufacture coverage where none would otherwise exist are the type of circumstances that render a judgment unenforceable against an insurer.

### C.   Unreasonableness

There is another ground on which the Court could find the judgment unenforceable against Century: unreasonableness of the default judgment. *See Pruyn*, 36 Cal. App. 4th at 515 (a judgment will be enforceable only where "such settlement is not unreasonable.") The Court is hesitant to do so because the transcript from the underlying "prove up" hearing has apparently been lost.[8] Nonetheless, the facts from the record the Court does have before it provide support for such a finding.

In the August 2007 letter sent by the Carlsons to the insured, the Carlsons stated, "As you will see in this Complaint, our damages were as of the end of June, 2007, approximately $65,000, and our damages have been increasing by more than $3,000 each and every month." *See* CS 0485. Once it became clear the Carlsons were facing a default judgment, however, they filed a Second Amended Complaint claiming $2.9 million in damages, including pre-judgment interest of $928,200.00, excluding attorney's fees. Def.'s Ex. 35, at 3. On November 3, 2010, the Carlsons filed an additional statement of damages for emotional distress in the amount of $200,000. *Id.*, Ex. 36.

The only documentation the Court has regarding the default judgment hearing are the "Mini-Minutes" of the November 16, 2010 hearing. *See id.*, Ex. 37. They state:

---

[8]Century has filed a complaint with the Court Reporters Board of California regarding the missing transcript. See Darling-Alderton Decl., ¶ 4.

> Alan L. Martini, Esq. appeared with plaintiffs Ron Carlson and Marion Benjamin Carlson, who were placed under oath and examined. No appearance by defendants Gold Mountain Investments, Inc., dba Prudential California Realty or Jane Lyla Oberg. Default was entered against defendant Jane Lyla Oberg on September 22, 2010. Default was entered against defendant Gold Mountain Investments, Inc., dba Prudential California Realty.
>
> After hearing the evidence presented, and good cause appearing, the Court rules in favor of Plaintiffs Ron Carlson and Marion Benjamin Carlson, and against the Defaulted Defendants Gold Mountain Investments, Inc. dba Prudential California Realty, and Jane Lyla Oberg as follows:
>
> Damages/Principal - $1,995,181.01
> Prejudgment Interest - $928,200.00
> Attorney's Fees - Reserved.
> Costs - $953.60
>
> Counsel shall submit a declaration re: calculation of attorney fees and a proposed judgment to the Court no later than Friday November 19, 2010.

*Id.* Plaintiffs' attorney thereafter provided a declaration in support of award of attorney's fees. Def.'s Ex. 38. He stated that "in non-contingency cases, I routinely charge an hourly rate of $200-$250 per hour," but as he took this case on a contingency basis and given the "prolonged and complex nature of this case, as well as the significant risks of no monetary recovery . . . if I were to charge an hourly rate on a contingency basis, it would be a minimum of $1,000." *Id.* Without providing a schedule of his hours, he requested the court provided him $421,000, which he argued was "reasonable in light of the judgment rendered by the court in the amount of $3,923,951."[9] Def.'s Ex. 38, at 6. The court reduced the attorney fees by half, to $210,500.00, and awarded a total judgment of $3,334,834.61. Def.'s Ex. 39, at 2.

Ron Carlson created a separate chart to document the Carlsons' damages. R. Carlson Dep., 44:9-10. The chart details how the Carlsons reached the damage number they relied on. Def.'s Ex. 41.

The chart includes the mortgage payments, electric bills, and property value loss of the Landmark Property, the home that failed to sell. *Id.* The chart also contains, however, the costs of maintaining two other homes the Carlsons separately moved into in 2006. The Carlsons filed for divorce in June 2006. M. Carlson Dep., 46:22. Marion Carlson moved out of the Landmark property on August 1, 2006, prior to the cancellation of the contract to sell the home. *Id.*, 47:1-2. She moved into

---

[9]The judgment was actually rendered in the amount of $2,924,334.60. The Court assumes this was merely a typographical error on the part of counsel when requesting fees.

the "Everson Property," for which she obtained a mortgage. *Id.*, 36:10-18. Ron Carlson also moved out on August 1, 2006, to a leased property. R. Carlson Dep. 47:17-25. When asked, "whether or not the Landmark property sold, you two were planning to maintain separate living residences after the divorce; correct?", Marion Carlson answered, "Separate living, yes, because I had already purchased my house in San Francisco." *Id.*, 47:3-7. Despite the fact that the Carlsons would have to pay the mortgage, rent, and taxes on their respective homes whether or not the Landmark property sold, they included those expenses as part of their "damages" from the failed sale. *See* Ex. 41. This included the Everson loan amount of $300,000 plus $1,531.25 for 52 months, the "Everson Property Value Loss" of $100,000, Ron Carlson's $2,000 per month rental, and taxes and association fees on the Everson Property totaling over $50,000. *Id.*

"Whatever its measure in a given case, it is fundamental that damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery. However, recovery is allowed if claimed benefits are reasonably certain to have been realized but for the wrongful act of the opposing party." *Piscitelli v. Freidenberg*, 87 Cal. App. 4th 953, 989 (2001) (*citing Williams v. Krumsiek*, 109 Cal. App. 2d 456, 459 (1952)); *see also Mendoza v. Ruesga*, 169 Cal. App. 4th 270, 287 (2008) ("Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence; double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited.") The Carlsons' attempt to seek recovery for expenses they would have incurred regardless of the sale of the Landmark Property amounts to an attempt to seek a windfall from whoever they were suing, whether it was the insured or Century. These are not the type of but-for compensatory damages allowed under these circumstances.

Because the Court does not have the transcript of the default judgment hearing, it cannot determine the extent to which the state court engaged in analysis of the propriety of the damage calculation. In cautioning the potential for fraud in a consent judgment with a covenant not to execute, the *Pruyn* court noted, "the insured's bests interests are served by agreeing to damages in any amount as long as the agreement requires the insured will not be personally responsible for those damages." *Pruyn*, 36 Cal. App. 4th at 518. The record demonstrates that plaintiffs sought unrecoverable damage

15

amounts in an uncontested prove up hearing. This provides support for finding unreasonable the default judgment, and thus rendering it unenforceable against Century.

**2.   Damages**

The question remains as to what damages the Carlsons may seek. The Carlsons request that if Century is not bound to pay the judgment, the Court hold a "trial within a trial" to determine "what the reasonable value of the Carlsons' claim actually was." *See* Doc. 73, Pls.' Supp. Brief on Damages at 9-10.

The Court disagrees with this approach. Because the Carlsons gained the right to sue Century through an assignment of rights in the Settlement Agreement, and because the Court finds that the Settlement Agreement was the product of fraud, the Carlsons have lost their standing to sue Century. *See* Settlement Agreement ¶ 8, Ex. 6, Martini Decl., Doc. 12. Justice Croskey delineates limitations on the assignability of an insured's claim against an insurer:

> Assignments that are the product of fraud or collusion between the insured and injured party convey *no rights* against the insurer. E.g., insured agrees to give false testimony that he or she was at fault to facilitate injured party recovering excess judgment, which will then be the basis for assigning 'bad faith claim' against the carrier. See *Critz v. Farmers Ins. Group*, 230 Cal. App.2d 788, 802 (1964) (disapproved on other grounds in *Crisci v. Security Ins. Co. of New Haven, Conn*., 66 Cal. 2d 425 (1967).

H. Walter Croskey, et al., California Practice Guide: Insurance Litigation (The Rutter Group 2010) § 12:507 (emphasis added).

Here, the only parties injured by Century's failure to defend were its insureds. They have assigned their rights through a Settlement Agreement that was the product of fraud. Because the fraud is the basis of the Settlement Agreement, the entire agreement is no longer valid, including the assignment of rights. Because the plaintiffs no longer have standing, the case is DISMISSED.

**CONCLUSION**

Upon reconsideration, the Court finds that it erred in characterizing the evidence that the Carlsons made pre-inception in-person demands from the insured as "undisputed." The Carlsons do

dispute that. Thus the Court erred in granting summary judgment on the issue of collusion,และ that determination is vacated.

However, the Court GRANTS summary judgment on the independent ground that the Settlement Agreement was the product of fraud, in that the Settlement Agreement declarations provided by the insured were materially false. The Court also GRANTS summary judgment to Century on the issue of standing. This case is DISMISSED due to lack of standing.

**IT IS SO ORDERED.**

Dated: March 26, 2012

SUSAN ILLSTON
United States District Judge